ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
    – and –
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL FAGAN, Individually and on Behalf of All Others Similarly Situated,<br><br>                   Plaintiff,<br><br>    vs.<br><br>AMPLITUDE, INC., SPENSER SKATES, and HOANG VUONG,<br><br>                 Defendants. | Case No.   3:24-cv-00898<br><br>_CLASS ACTION_<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br>_DEMAND FOR JURY TRIAL_ |

Plaintiff Daniel Fagan ("plaintiff"), by and through plaintiff's undersigned attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of defendants' public documents, conference calls, announcements, and U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Amplitude, Inc. ("Amplitude" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired Amplitude stock between September 21, 2021 and February 16, 2022, inclusive ("Class Period"), seeking to pursue remedies and recover damages caused by defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.      Amplitude is a technology company that helps businesses analyze data for their digital products and track customer interactions. Beginning in September 2021, Amplitude claimed to be experiencing extraordinary growth due to "strong demand for [its products]" and a "robust" expansion from existing customers. Specifically, in connection with the Company's second quarter 2021 ("2Q21") earnings, Amplitude reported that "revenue growth accelerated" during the quarter and was "up 66% year over year." The Company similarly reported that a key growth metric, known as current remaining performance obligations ("cRPO"), was up 76% year-over-year and that its dollar-based net retention rate ("NRR") was 119%.

3.      Amplitude operates in a nascent industry: the digital optimization market. In addition, the Company has historically not been profitable. Thus, it was critical to investors that

Amplitude continue its impressive growth trajectory, so that it could demonstrate a sustained market for its products and services and ultimately achieve profitability.  Throughout the Class Period, defendants claimed that this was in fact occurring.  For example, when asked during the 2Q21 earnings call whether the business acceleration achieved by the Company during the quarter was sustainable, Amplitude's Chief Financial Officer ("CFO") Hoang Vuong ("Vuong") responded: "Yes."

4.    Key to this purportedly sustainable acceleration was the Company's "land-and-expand strategy," whereby the Company grew revenue by upselling existing clients on increased usage and new products.  In SEC filings, Amplitude listed this strategy as among its most important growth initiatives and represented that, as Amplitude "customers experience the value of our platform in helping to drive business outcomes in that initial use case, they frequently expand that initial use case, expand into new use cases, and expand into additional products."  In connection with Amplitude's 2Q21 results, CFO Vuong told investors: "Expansion from existing customers were particularly robust as the team continued to execute well on our land-and-expand strategy."  Similarly, in connection with Amplitude's third quarter 2021 ("3Q21") results, Chief Executive Officer ("CEO") Spenser Skates ("Skates") stated: "Existing customer demand for Amplitude was also strong, with expanding customer usage and solid traction with our new products . . . ."

5.    In September 2021, Amplitude conducted its initial public offering via direct listing (the "IPO").  Unlike a traditional initial public offering, which is underwritten at a set price, a direct listing is a public offering wherein existing shareholders can sell shares directly into the market at whatever prices the market will bear.  The company often raises no money, and executives who can dump tens of millions of dollars' worth of their personally held shares in the listing company have a strong incentive to keep the stock price as high as possible.

6.    Defendants' Class Period statements successfully caused the price of Amplitude stock to soar.  On September 28, 2021, the stock opened at more than $50 per share on its first day

of trading – more than 40% above the established reference price of $35 per share[1] – and reached highs of nearly $90 per share by the end 2021. Capitalizing on their rosy assessments and reassurances regarding Amplitude's rapid growth trajectory and ability to sustain outsized gains through the Company's land-and-expand strategy, in the months following the IPO Amplitude's senior management and Company insiders cashed out more than $275 million in Amplitude stock at artificially inflated prices, including more than $30 million by CEO Skates and more than $17 million by CFO Vuong at prices as high as $74 per share.

7. Almost immediately after this insider selling spree ended, Amplitude's high-flying stock price crashed back to reality. After the market closed on February 16, 2022, Amplitude revealed its fourth quarter 2021 ("4Q21") results and revised downward its 2022 fiscal guidance. Most troubling, the Company revealed that its vaunted land-and-expand strategy, which defendants had claimed had already proven successful, was in fact poised to "take a few years" before it was expected to accelerate results and that despite their prior assurances of sustainable growth, Amplitude management "really [did not] know" when this impact would occur. Following this news, the price of Amplitude common stock plunged. After closing at $41.61 per share on February 16, 2022, the stock dropped more than **58%** – or $24.51 per share – to close at $17.10 per share on February 17, 2022, on unusually high trading volume of more than 20 million shares traded.

8. As a result of defendants' wrongful acts and omissions, and the subsequent declines in the market value of Amplitude stock, which dropped nearly **80%** from its Class Period peak, plaintiff and other members of the Class (defined below) suffered losses and damages.

---

[1] A reference price is meant to be a guide that informs the public of a potential initial market price for stock sold in a direct listing based on investor interest in the stock.

1

2   **JURISDICTION AND VENUE**

      9.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the

3   Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R.

4   §240.10b-5.

5

      10.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of

6   the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

7

8         11.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C.

9   §78aa, and 28 U.S.C. §1391(b).  Many of the acts and transactions that constitute the alleged

10  violations of law, including the dissemination to the public of untrue statements of material fact,

11  occurred in this District.  The Company's headquarters are located in this District at 201 Third

12  Street, Suite 200, San Francisco, California 94103.

13

14        12.     In connection with the acts alleged in this complaint, defendants, directly or

15  indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

16  to, the mails, interstate telephone communications, and the facilities of the national securities

17  markets.

18  **PARTIES**

19        13.     Plaintiff Daniel Fagan purchased Amplitude stock as described in the attached

20  certification, which is incorporated herein by reference, and suffered damages as a result of the

21  conduct alleged herein.

22

23        14.     Defendant Amplitude, Inc. is incorporated in Delaware and has its headquarters in

24  this District.  Shares of Amplitude stock trade on the Nasdaq under the ticker symbol "AMPL."

25        15.     Defendant Spenser Skates co-founded Amplitude in 2012 and is the Company's

26  CEO and a member of its Board of Directors (the "Board").

27

28

16.     Defendant Hoang Vuong was the Company's CFO from April 2019 until February 2023, when he was replaced by Christopher Harms as the Company's next CFO.

17.     Defendants Skates and Vuong are collectively referred to as the "Individual Defendants."  The Individual Defendants, together with Amplitude, are collectively "defendants."

18.     Each of the Individual Defendants acted and/or made the statements detailed herein in his capacity as an officer and/or director of Amplitude.  Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, and present and future business prospects.   In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

19.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

**BACKGROUND**

20.     Amplitude makes software for what it refers to as "digital optimization," or the process of helping companies figure out more about how their customers engage with the companies' digital experiences.  Amplitude's technology is designed to provide insights regarding how customers interact with digital platforms or "apps," allowing companies to determine which features are resonating with customers and tweak their products to maximize user engagement, monetization, and other desirable metrics.

21.     The Company's main product offering is called Amplitude Analytics, which consists of product-analytics tools.  The Company launched two new offerings in the middle of 2021.  One, called Amplitude Recommend, allows companies to send customized suggestions to their users depending on the users' past behaviors.  The other, called Amplitude Experiment, lets companies run various tests and otherwise try out different user experiences.

22.     Leading up to the start of the Class Period, Amplitude rapidly grew its revenues, but was not profitable.  The Company reported $16.5 million in losses for the six months ended June 30, 2021, compared to $16.6 million in losses for the same time period in 2020.  It was, therefore, critically important for investors that the Company continue growing revenues at a rapid pace.  Based on statements by the Individual Defendants and the Company, investors expected just that at the time of the Company's direct listing.  For example, the Company's revenue for the first six months of 2021 grew by 57% to $72 million compared to $46 million during the same period in 2020.  For the rest of 2021, Amplitude told investors it expected continued, rapid growth in revenues in the range of $160 million to $162 million, representing 57% year-over-year revenue growth at the midpoint.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD**

23.     On September 21, 2021 – the same day that Amplitude announced that the registration statement for the IPO had been declared effective – the Company issued a press release announcing its financial results for its 2Q21.  The release highlighted several metrics that purportedly showed favorable growth at the Company, including 66% quarterly revenue growth, 76% cRPO growth, and a 119% NRR.  The release further stated that "the Company expects that its full year 2022 total revenue growth will be in excess of 40%."  The 2Q21 earnings release included the following statement from defendants Skates:

> "The acceleration of the digital world has put digital products at the center of business.  Digital products are driving how businesses operate, go to market and generate revenue . . . .  As organizations make the shift to product-led growth, they are turning to Amplitude to help drive business outcomes.  ***Great execution combined with strong demand for the Amplitude Digital Optimization System has led to our exceptional second quarter results***, highlighted by revenue growth of 66% year-over-year, and a strong outlook for the year.  ***We believe we are in the very early stages of a large opportunity*** and that we can help companies of various sizes and digital maturities build great products through data."

24.     On September 21, 2021, the Company hosted its 2Q21 earnings call led by defendants Skates and Vuong.  In his prepared remarks, defendant Skates stated that "Amplitude had an outstanding second quarter, reflecting the rapid acceleration of the digital world and great execution by our team."  In particular, defendant Skates represented: "Marketing, product, data science and vendor teams increased their Amplitude usage and event volume substantially over this time frame, including a volume-based upsell in Q2."

25.     During his prepared remarks, defendant Vuong emphasized: "Expansion from existing customers were particularly robust as the team continued to execute well on our land-and-expand strategy."  Later, when asked by Amplitude's investor relations representative: "What are some of the assumptions that you've built into your guidance given the acceleration you saw in Q2?  And is that sustainable?," defendant Vuong responded: "***Yes***."

26.     As the call continued, defendant Vuong was asked about the primary drivers for Amplitude's customer expansions.  He responded that the expansion was "coming from multiple angle[s]," stating in pertinent part as follows:

> As far as some of the primary driver for driving expansion, we're really excited by the fact that, when we look at Q2, **we saw expansion coming from multiple angle[s].  We saw folks that are just expanding purely because of their expanding from volume**.  As Spenser highlighted, **we also saw a few customers added Recommend and Experiment**.  Now I want to be careful that those are still relatively new and still relatively small, but it's really an encouraging sign to see. **And then we also saw other customers really adding and expanding it into other product lines and business units**.  And so there wasn't one massive thing or another. **It actually kind of came pretty healthy in terms of the larger expansion coming from [either just] volume or people expanding into additional product lines**.

27.     On September 28, 2021, Amplitude filed with the SEC the prospectus for the IPO on Form 424B4, which was signed by defendants Skates and Vuong among others ("the Prospectus").  The Prospectus highlighted the Company's land-and-expand strategy as one of its primary "Growth Strategies," stating in pertinent part as follows:

- **Expand Across Our Existing Customer Base**.  We believe that there are significant opportunities to continue to expand our relationships with our existing customers.  We employ a land and expand business model designed to land with an initial use case and expand through onboarding additional functional teams, products, and use cases.

  - Promote Upsell: **Once a customer is on our platform there are many ways we can promote upsell opportunities**.  Customers can expand an initial use case by adding additional events or functionality to generate deeper analytics.  They can also expand into additional functional teams who are looking to address a related use case or bring new digital products on our platform, both of which require additional data to be instrumented.

  - Drive Cross-sell: **Our platform delivers end-to-end optimization that allows our customers to expand beyond analytics and layer on additional products, such as Recommend and Experiment, and we offer to optimize the digital product experiences of their customers**.

  **Within our largest customers, we have demonstrated our ability to grow our reach to include thousands of users across their organization who leverage our system to drive business outcomes.  Our dollar-based net retention rate as of December 31, 2020 and June 30, 2021 was 119% for paying customers**.

28.     The Prospectus represented that this land-and-expand strategy was already working, claiming that Amplitude customers "frequently expand" after being onboarded to Amplitude products and had already been "demonstrated" by Amplitude's existing NRR, stating in pertinent part as follows:

> ***As customers experience the value of our platform in helping to drive business outcomes in that initial use case, they frequently expand that initial use case, expand into new use cases, and expand into additional products. Our ability to expand successfully within our customer base is demonstrated by our strong dollar-based net retention rates***. As of December 31, 2019 and 2020, our dollar-based net retention rate across paying customers was 116% and 119%, respectively.

29.     The Prospectus also emphasized that industry trends had moved in the Company's favor and that the Company's digital optimization products would "***be a strategic business imperative as digital transformation continues at an accelerated pace***," and that digital optimization was needed for businesses "to make sense of the exponential increase in digital product and user behavioral data to help ensure businesses are making the right product bets and to maximize their impact." The Prospectus touted the $37 billion market for digital optimization and described the Company's market leader position in the digital analytics space as one of the Company's key "competitive strengths."

30.     On September 29, 2021, CEO Skates participated in an online AMA (ask me anything) session, fielding questions from online participants. When asked where he saw the Company going now that it was public, Skates highlighted that the Company was experiencing explosive revenue growth, writing, in relevant part:

> I feel good about the massive market as well as our differentiation. The #1 challenge is getting the right team in place to execute successfully against the opportunity. ***When you're growing 50-60% YoY***, you have an entirely new company every 2 years. There is such a high degree of variation between people that just because you're a high functioning organization today does not guarantee you will be tomorrow. My biggest lever on it as CEO is the leaders we bring into the business and so I spend a lot of time thinking about how to get that right.

31.     During the same AMA, Skates touted the value of Amplitude's stock price, stating that a traditional IPO "sets you up to massively underprice your stock" and that, in his opinion,

"companies that went through the traditional IPO process underpriced their stock by 50%," strongly implying that Amplitude's direct listing stock price, which opened at $50 per share, accurately valued the Company.  When asked why he took the Company public, Skates answered, in relevant part, by writing:

> You really should take your company public once you reach 100M in ARR.  The expectation for performance across the board goes up and good companies rise to meet the moment.  ***You're expected to do a better job of forecasting and planning your business, telling your story, sharing your long term vision, ensuring proper financial and legal oversight, and a lot else.***  Companies staying private so much longer has been bad for the them and for the ecosystem IMO.

32.     Discussing the Company's path to a direct listing instead of a traditional IPO, Skates stated:

> My absolute favorite argument was that if you price too high, you price out people who will stick with you, and that will cause your price to be lower in the future than it would have been otherwise.  Luckily, I did a year in the finance world in high frequency trading so they couldn't pull this one on me.  That logic is the opposite of how pricing in a market works.  ***High prices now are a signal that prices in the future are expected to be higher.  If you want your price to be higher in the future, having it be higher in the present will increase the likelihood of that outcome***.  The thinking reminded me of Yogi Berra's famous quote: "Nobody goes there anymore.  It's too crowded."

33.     On November 9, 2021, Amplitude issued a press release announcing its financial results for its 3Q21.  The release highlighted several metrics that purportedly showed favorable growth at the Company, including 72% quarterly revenue growth, 66% cRPO growth, and a 121% NRR.  The release quoted defendant Skates, who stated: "'Good execution combined with strong demand for the Amplitude Digital Optimization System drove our third quarter results.  We believe we are in the very early stages of a large market opportunity . . . .'"

34.     Also on November 9, 2021, the Company hosted its 3Q21 earnings call led by defendants Skates and Vuong.  During his prepared remarks, defendant Skates stated: "Existing customer demand for Amplitude was also strong, with expanding customer usage and solid traction with our new products, Recommend and Experiment."  He continued: "This was further demonstrated by a dollar-based net retention rate of 121%, which improved 200 basis points year-on-year."  Defendant Skates later stated: "We're also seeing the power of Amplitude's digital

optimization system help with customers' critical business goals and enable them to become more product-led," which he claimed "leads to more expansion and upsells within existing accounts and increasing customer adoption with our new products." Defendant Skates then walked investors through several purported examples of Amplitude's success in upselling clients and employing their land-and-expand strategy.

35.    In his prepared remarks, defendant Vuong stated that "we had some large expansion in Q2 '21 along with easier year-over-year comp due to the impact of COVID that are contributing to our growth rate" and claimed that Amplitude "ended Q3 '21 with 1,417 paying customers, an increase of 54% year-over-year versus 51% last quarter, continuing the acceleration of customer growth." He continued: "***Overall, our team continues to execute well on our land-and-expand strategy***, improving our dollar-based Net Retention Rate, or our NRR, to 121% and up 200 basis points both sequentially and year-over-year."

36.    When asked by an analyst about the Company's cross-sell opportunities, defendant Vuong reassured investors that the Company was successfully pulling multiple levers in its land-and-expand strategy, stating in pertinent part as follows:

> ***I think as we look at the kind of medium-, long-term, we see opportunity to grow net retention rate, not just from [extension], as you mentioned, with both volume up-sell, but what we consider a horizontal upsell, where you're selling to different use cases or additional business unit and product line inside of the company. And then, obviously, the addition of Recommend and Experiment, as you just mentioned, that just gives us additional firepower to go after our existing base***.
>
> ***And so the combination of those strengths that we're seeing, along with we mentioned in Q2 we had some really great expansion***, and then coming off of some quarters that had, let's say, more churn coming from SMB and other from COVID is why we're seeing the increase in that retention rate. And our goal is to try to maintain that and keep that well above $120 million.

37.    Similarly, when defendant Vuong was asked about Amplitude's sales and marketing efforts, he responded: "I think we feel really great about, first, [getting] the story that we're able to tell both in the market and the customers and the success that we're actually having in terms of winning new customer and expanding customers."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                                    - 11

38.     The statements referenced in ¶¶23-37 above were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them as follows:

(a)     that Amplitude's land-and-expand strategy was years away from significantly accelerating revenues among its newer client cohorts;

(b)     that the rapid acceleration in the Company's 2Q21 results resulted from the ephemeral effects of the COVID-19 pandemic which had not continued by the start of the Class Period, as Amplitude clients were expanding at a slower pace; and

(c)      that, as a result of (a)-(b) above, Amplitude's business, operations, financial results, and prospects were materially worse than represented to investors during the Class Period.

39.     Then, after the market closed on February 16, 2022, the Company issued a press release announcing its 4Q21 financial results.  The release revised downward the Company's 2022 revenue guidance, from more than 40% to a range of $226 million to $234 million (or 35% to 40%).

40.     Also on February 16, 2022, Amplitude hosted its 4Q21 earnings call which was led by defendants Skates and Vuong.  During his prepared remarks, defendant Vuong stated that the Company was still "a few years" away from many of its new customers "completely embrac[ing] the full capability of [Amplitude's] digital optimization," which he stated would eventually "drive larger expansion."  Although defendants had previously indicated that significant expansions were "frequently" occurring, defendant Vuong stated that, in fact, "the precise timing of these can fluctuate and that timing uncertainty is reflected in our 2022 guidance."

41.     When questioned why the Company was not expanding as rapidly as before, defendant Vuong stated that the Company's prior success was the temporary result of the COVID-19 pandemic, which had worn off, and "[w]e obviously expected that growth rate to kind of slow

down or decline."  He further stated that "it's just not clear for us right now in terms of the exact timing of these expansions" and that the Company was progressing "slower" than previously.

42.    Defendants were pressed more during the call on the sudden admission that Amplitude's expansion efforts were slowing, as analysts asked why its customers "were really not expanding where you expected?" and whether Amplitude needed "to rectify that from a product perspective?" or take some other action.  In response, defendant Skates stated that the "precise timing of these expansions can fluctuate."  He later stated that "it's not just a one quarter or one year thing.  It can take many years even in these companies that are very tech forward because they're adopting a new way of building their product."  In response to an analyst who questioned how it could be that the Company was now saying, "we don't know when the expansion is going to happen," defendant Skates stated in pertinent part as follows:

> As to the timing comment, I think this is something, frankly, I've seen as CEO since the very beginning of Amplitude.  Like you come in, you land with a team and they'll start to get some wins and then that religion will grow and get adopted by the rest of the company.  ***But that process, it can take a few years.  It's not just like a one-quarter thing where it's like, all right, let's roll this whole thing out from day one***.

43.    Reacting to the revelation that Amplitude's vaunted land-and-expand strategy was still years away from accelerating revenue growth with the Company's new clients and that the touted acceleration from 2Q21 was due to the ephemeral effects of the COVID-19 pandemic rather than sustainable business factors, the price of Amplitude stock plummeted.  After closing at $41.61 per share on February 16, 2022, the stock opened at $26 per share on February 17, 2022, ***37%*** lower than its prior close, and continued dropping throughout the day, ultimately closing at $17.10, down nearly ***59%*** on elevated trading volume of more than 20 million shares traded.

44.    In the wake of defendants' disclosures, analysts imposed significant cuts on their price targets for Amplitude stock.  For example, on February 17, 2022, Morgan Stanley lowered its price target on Amplitude stock by more than 50%, from $70 per share to $34 per share, and wrote that "Amplitude's second quarter as a public company fell short of expectations" because of

customers "expanding spend at a slower rate" and added "[w]e expect shares to be under pressure until we see evidence of faster execution against the emerging Digital Optimizing software opportunity, supporting upside to guidance and limiting the growth deceleration into FY22 (+37.5% from +63.2% in FY21)."

45.     Similarly, on February 17, 2022, BofA Global Research cut its Amplitude price target to $38 per share from $65 per share, and stated that Amplitude's

> 2022 revenue guidance that came in below the Street, and management's commentary on the puts and takes raises several questions on: 1) the stability of the future growth profile, 2) the magnitude of pandemic pull-forward tailwinds turning into headwinds, 3) visibility into the pipeline and end-market demand trends, 4) overall competitive environment, and 5) execution risks.

46.     Although the Company ultimately achieved 40% revenue growth in 2022, the weakness in its land-and-expand strategy has kept the price of Amplitude stock depressed.  The price of Amplitude Class A stock currently trades at less than $15 per share, more than 80% below the Class Period high.

47.     As a result of defendants' wrongful acts and omissions, and the subsequent declines in the market value of the Company's stock, plaintiff and other Class members suffered losses and damages.

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

48.     Defendants are liable for: (i) making false statements; and/or (ii) failing to disclose adverse facts known to them about Amplitude.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Amplitude stock was a success, as it: (i) deceived the investing public regarding Amplitude's prospects and business; (ii) artificially inflated the price of Amplitude stock; and (iii) caused plaintiff and other members of the Class to purchase Amplitude stock at artificially inflated prices and suffer damages when that artificial inflation was removed from the price of Amplitude stock.

**CLASS ACTION ALLEGATIONS**

49.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Amplitude stock during the Class Period and were damaged thereby as alleged herein (the "Class").  Excluded from the Class are defendants and their immediate families, the officers, directors, and affiliates of defendants, at all relevant times, and their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

50.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Amplitude stock trades on the Nasdaq and Amplitude has millions of shares outstanding, owned by hundreds, if not thousands, of persons.

51.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    whether defendants violated the Exchange Act;

(b)    whether statements made by defendants to the investing public omitted and/or misrepresented material facts about Amplitude;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    whether the price of Amplitude stock was artificially inflated; and

(f)    the extent of damages sustained by Class members and the appropriate measure of damages.

52.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

53.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

54.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

55.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and omitted material facts, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Amplitude, their control over and/or receipt and/or modification of allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Amplitude, participated in the fraudulent scheme alleged herein.

56.     Amplitude's land-and-expand strategy was one of the Company's primary growth initiatives and was closely followed and overseen by the Individual Defendants, who held themselves out to the market as the persons most knowledgeable about its implementation.  For example, defendant Vuong stated that Amplitude's management looks at "all the metrics . . . in terms of the product usage and what we call weekly learning users" to get a sense of expansion. Defendant Vuong has also admitted that the Company did not expect the growth rate experienced

1    in 2Q21 to continue and that they had known that Amplitude customers were expanding at a

2    "slower" rate.

3       57.     Defendants also had the motive and opportunity to commit fraud.  In the months

4    following the IPO Amplitude's senior management and Company insiders cashed out more than

5    $275 million in Amplitude stock at artificially inflated prices, including more than $30 million by

6    CEO Skates and more than $17 million by CFO Vuong at prices as high as $74 per share.

7                        **LOSS CAUSATION/ECONOMIC LOSS**

8       58.     During the Class Period, as detailed herein, defendants engaged in a scheme to

9    deceive the market and a course of conduct that artificially inflated the price of Amplitude stock

10   and operated as a fraud or deceit on Class Period purchasers of Amplitude stock by failing to

11   disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior

12   misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the

13   price of Amplitude stock fell precipitously as the prior artificial inflation came out of the stock's

14   price.  As a result of their purchases of Amplitude stock during the Class Period, plaintiff and the

15   other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when

16   the truth about Amplitude was revealed through the disclosures specified herein, which removed

17   the artificial inflation from the price of Amplitude stock.

18       59.     By failing to disclose to investors the adverse facts detailed herein, defendants

19   presented a misleading picture of Amplitude's business and prospects.  Defendants' false and

20   misleading statements had the intended effect and caused Amplitude stock to trade at artificially

21   inflated levels throughout the Class Period.

22       60.     As a direct result of the disclosures identified herein, the price of Amplitude stock

23   fell precipitously.  This removed the artificial inflation from the price of Amplitude stock, causing

24   real economic loss to investors who had purchased Amplitude stock at artificially inflated prices

25   during the Class Period.

61.     The price declines were a direct result of the nature and extent of defendants' fraud being revealed to investors and the market through partial disclosures. The timing and magnitude of the price declines in Amplitude stock negate any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Amplitude stock and the subsequent significant declines in the value of Amplitude stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

62.     At all relevant times, the market for Amplitude stock was an efficient market for the following reasons, among others:

(a)     Amplitude stock met the requirements for listing and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b)     as a regulated issuer, Amplitude filed periodic public reports with the SEC;

(c)     Amplitude regularly communicated with public investors via established market communication mechanisms, including the regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Amplitude was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

63.     As a result of the foregoing, the market for Amplitude stock promptly digested current information regarding Amplitude from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Amplitude stock during the Class Period suffered similar injury through their purchase of Amplitude stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

64.     The "Safe Harbor" warnings accompanying Amplitude's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with generally accepted accounting principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

65.     Defendants are also liable for any false and misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Amplitude who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

66.     Plaintiff incorporates ¶¶1-65 by reference.

67.     During the Class Period, Amplitude and the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68.     Amplitude and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Amplitude stock during the Class Period.

69.     In addition to the duties of full disclosure imposed on Amplitude and the Individual Defendants as a result of their affirmative false and misleading statements to the public, they had a duty to promptly disseminate truthful information with respect to Amplitude's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, so that the market price of the Company's stock would be based on truthful, complete, and accurate information.  SEC Regulation S-X, 17 C.F.R. §210.1-01 *et seq.*; SEC Regulation S-K, 17 C.F.R. §229.10 *et seq.*

70.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Amplitude stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Amplitude stock and experienced losses when the artificial inflation was released from Amplitude stock as a result of the partial revelations and price declines detailed

herein.  Plaintiff and the Class would not have purchased Amplitude stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

71.     By virtue of the foregoing, Amplitude and the Individual Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

72.     Plaintiff incorporates ¶¶1-71 by reference.

73.     Amplitude and the Individual Defendants acted as controlling persons of Amplitude within the meaning of §20(a) of the Exchange Act.  By reason of their controlling positions with the Company, and their ownership of Amplitude stock, the Individual Defendants had the power and authority to cause Amplitude to engage in the wrongful conduct complained of herein.  Amplitude controlled the Individual Defendants and all of its employees.  By reason of such conduct, Amplitude and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, and certifying plaintiff as a Class representative and appointing plaintiff's counsel as Lead Counsel under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 21 -

1        C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in

2  this action, including counsel fees and expert fees; and

3        D.     Awarding such equitable, injunctive, or other relief as deemed appropriate by the

4  Court.

5

6                                **JURY DEMAND**

7        Plaintiff demands a trial by jury.

8   DATED: February 14, 2024          ROBBINS GELLER RUDMAN
                                                   &DOWD LLP

9                                      SHAWN A. WILLIAMS

10

11                                   s/ Shawn A. Williams
                                 SHAWN A. WILLIAMS

12                              Post Montgomery Center
                              One Montgomery Street, Suite 1800

13                              San Francisco, CA  94104
                              Telephone:  415/288-4545

14                              415/288-4534 (fax)

15                              ROBBINS GELLER RUDMAN
                                  &DOWD LLP

16                              BRIAN E. COCHRAN
                              655 West Broadway, Suite 1900

17                            San Diego, CA  92101-8498
                              Telephone:  619/231-1058

18                            619/231-7423 (fax)

19                            ROBBINS GELLER RUDMAN
                                &DOWD LLP

20                            SAMUEL H. RUDMAN
                            58 South Service Road, Suite 200

21                          Melville, NY  11747
                            Telephone:  631/367-7100

22                          631/367-1173 (fax)

23                          ROBBINS GELLER RUDMAN
                                &DOWD LLP

24                          ROBERT J. ROBBINS
                            225 NE Mizner Boulevard, Suite 720

25                          Boca Raton, FL  33432
                            Telephone:  561/750-3000

26                          561/750-3364 (fax)

27

28

1

2
ROBBINS LLP
GREGORY E. DEL GAIZO
3
5060 Shoreham Place, Suite 300
San Diego, CA  92122
4
Telephone:  619/525-3990
619/525-3991 (fax)

5
Attorneys for Plaintiff

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAW</u>

Daniel Fagan ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.      Plaintiff has reviewed the Class Action Complaint and has retained Robbins LLP as counsel in this action for all purposes, and authorized the filing of the Complaint.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| AMPL | Purchase | 26 | 12/23/21 | $55.48 |
|  |  |  |  |  |
|  |  |  |  |  |

4.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

5.      Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below:

_____

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

7.      Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _____ day of ____February____, 2024.

13

DocuSigned by:

*Daniel Fagan*

EFF47DAF37A348D...

DANIEL FAGAN