UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHICAGO & VICINITY LABORERS' DISTRICT COUNCIL PENSION FUND,<br><br>Plaintiff,<br><br>v.<br><br>AMPLITUDE, INC., et al.,<br><br>Defendants. | Case No. 24-cv-00898-VC<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 56 |

The motion to dismiss is granted with leave to amend. This order assumes the reader's familiarity with the facts, relevant legal standards, and arguments made by the parties.

1. *Judicial Notice*. Amplitude's request for judicial notice is granted. SEC filings, press releases, conference call transcripts, and analyst reports cannot be judicially noticed for the truth of the statements they contain. But as the plaintiff acknowledges, judicial notice can be taken "of these types of documents for the purpose of determining what information was available to the market." *In re Splunk Inc. Securities Litigation*, 592 F. Supp. 3d 919, 930 (N.D. Cal. 2022) (taking judicial notice of SEC filings and earnings call transcripts); *see also, e.g.*, *In re Century Aluminum Co. Securities Litigation*, 2011 WL 830174, at *9 (N.D. Cal. Mar. 3, 2011) (taking judicial notice of analyst reports).

2. *Material Misrepresentation or Omission*. The complaint does not sufficiently plead any actionable misleading statements or omissions by Amplitude, Vuong, or Skates.

The complaint fails to state a claim as to Amplitude's alleged failure to disclose that it "was not continuing to benefit from COVID-19 tailwinds" because Amplitude did clearly disclose that it had benefited from such tailwinds and that those tailwinds might dissipate. At the

September 14, 2021, Investor Day, Vuong stated that the company was seeing "great tailwinds coming from" "post-COVID," acknowledging that the company's growth had been boosted by COVID-19. Amplitude also told investors that this might change: its initial registration statement stated that it was "not possible" to "predict the duration and extent of the impact that COVID-19 could have on" the company's business—and even more directly that, "as stay-at-home orders and other quarantine and isolation measures are lifted, the amount of time that consumers spend interacting with digital products may normalize or decline, which could slow customer demand for" Amplitude's products. And the complaint contains no particularized allegations that these tailwinds had begun to dissipate by September 2021 such that the statements made then were misleading. Because the relevant material information was disclosed to investors, the complaint fails to state a claim based on its omission. *See Oregon Public Employees Retirement Fund v. Apollo Group Inc.*, 774 F.3d 598, 607 (9th Cir. 2014).

      The complaint also fails to state a claim as to Amplitude's alleged failure to disclose that its "land and expand strategy was years away from significantly accelerating the expansion of revenue" among Amplitude customers, because Amplitude did communicate to investors that it could take years to scale up individual accounts. At Investor Day, Vuong stated that Amplitude didn't "know exactly" how long growth would take, and that sometimes accounts expanded to $1 million in a year but that sometimes it could take five years. And Skates gave several examples of Amplitude customers who had scaled up their Amplitude accounts over periods ranging from three to six years. So here too, plaintiffs' omission theory fails because Amplitude shared the relevant information with investors.

      Amplitude also disclosed to investors that its Q2 results were driven by early renewals. At the Q2 earnings call, Vuong said that the quarter's growth was driven by "some early customer renewals." The plaintiffs argue that "some" is an insufficient disclosure because the growth was in fact "substantially inflated" by early renewals. But the complaint does not contain any allegations that would explain why "driven by some early renewals" is false but "substantially inflated by early renewals" is true. Other than the vague allegation that Amplitude

2

"had made a strong push to complete deals before" the IPO, the confidential witness statements that the plaintiffs cite in support of this argument concern November 2021 and Q4, so cannot show that a statement about Q2 was false. Separately, the plaintiffs describe Vuong's February 2022 statement that Q2's growth was "a stronger quarter than normal" because of "some early expansion" as an admission that "it was actually early renewals that had caused 2Q21 results," and argue that this admission supports an inference that Vuong knew his earlier statements were false. But if "some" is strong enough to be an admission that shows that Vuong knew the earlier statements were misleading, it's unclear why it's too weak to constitute a disclosure of the impact of early renewals on the Q2 results.

      Finally, the complaint alleges that the statements about Amplitude's growth were misleading because—separate from the alleged failure to disclose the real reasons for the company's growth—Amplitude was not "continuing to see accelerating strong demand from customers," and growth was in fact "slowing or contracting as customers began to cancel or reduce contractual commitments." But the complaint does not adequately match up any particular statement with a reason or reasons why it is misleading. *See Oregon Public Employees*, 774 F.3d at 604.

      The only particularized allegations to support the claim that growth was slowing or contracting are the confidential witness statements. As noted above, these statements describe what was happening in Q4 and "by November 2021," so they can't show that any statements made in September were false. Although the confidential witness statements could show that statements made in November or December were false, none of the statements made in those months are actionably misleading. Most of the statements Vuong and Skates made at the November earnings call or the December UBS conference were forward-looking statements or were made in reference to past results. For example, while the complaint quotes Vuong as saying, "we continue to see great momentum in customers over $100,000"—a statement that could be actionably misleading if Vuong knew it was false—the transcript of the November earnings call reveals that Vuong actually said, "we'll continue to see great momentum," meaning

that it was a protected forward-looking statement. Similarly, although Vuong's statement that the "team continues to execute well" on the land-and-expand strategy was a present-tense remark on its face, it was made in the context of Vuong recounting Amplitude's Q3 numbers at a call about the company's Q3 earnings and thus was obviously in reference to Q3. *Cf. In re Apple Inc. Securities Litigation*, 2020 WL 6482014, at *5 (N.D. Cal. Nov. 4, 2020) (determining based on context that statements plausibly referred to the present). Even the sentence in which Vuong said those words ended with him recounting Amplitude's Q3 net retention rate.

Nor were any of the few present-tense statements made in November and December plausibly misleading. For instance, Vuong's statement that the company was "excited by the fact that it" was "adding more customer [*sic*]" and "reported accelerated growth in new customers" not only is partially in the past tense but is describing growth with respect to *new* customers, whereas the confidential witness statements concern partial churn that, by definition, could only have been ongoing with regard to existing customers. Similarly, Vuong's reference to "the success" that Amplitude was "actually having in terms of winning new customers and expanding customers," made in response to a question about the company's ability to staff its sales teams, is not plausibly misleading in that context, where it only amounts to a general statement that the company was not having problems hiring because it was having success in sales.

3. *Scienter*. Even if the complaint contained sufficient allegations of material misstatements or omissions, it does not contain allegations giving rise to a strong inference that either Skates or Vuong made misleading statements intentionally or with deliberate recklessness.

Most of the allegations in the complaint that the plaintiffs argue show scienter do not come close to doing so. Without more specific allegations that he knew early renewals were actually a substantial driver of Q2 growth, Vuong's disclosure that the quarter's results were driven by "some early renewals" does not raise any inference of scienter, let alone a strong one. That the "corrective disclosures" were made only a few months after the alleged misstatements also does not raise an inference of scienter in light of the various other disclosures in September. And given their timing—shortly after Amplitude's IPO and Q3 earnings—the stock sales were

4

not suspicious. *See In re Accuray, Inc. Securities Litigation¸* 757 F. Supp. 2d 936, 950 (N.D. Cal. 2010). Moreover, the complaint does not contain any allegations showing that they are out of line with prior trading practices. *See Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009). The plaintiffs cite no authority in support of their argument that a direct listing IPO is inherently suspicious.

The confidential witness statements come closer, but also ultimately fail to support a strong inference of scienter. For one thing, these statements say nothing about what Vuong knew or his state of mind. One witness did describe Skates as "involved with almost any large account that was seeing significant churn in trying to mitigate the churn," and Skates stated that Amplitude looked at certain user metrics that could reflect on customers' "willingness to buy." But the complaint doesn't describe with any specificity the nature or extent of Skates's involvement with those accounts (or even how many accounts were large enough and were seeing significant enough churn to warrant his involvement), or allege that Skates himself was looking at the user metrics. So these allegations alone do not raise a compelling inference of scienter. *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785–86 (9th Cir. 2008).

4. *Other Claims*. Because the § 10(b) and Rule 10b-5(b) claim is dismissed, so too are the § 20(a) claim and Rule 10b-5(a) and (c) claims. *In re NVIDIA Corp. Securities Litigation*, 768 F.3d 1046, 1052 (9th Cir. 2014) ("To establish a cause of action under" § 20(a), "a plaintiff must first prove a primary violation of underlying federal securities laws."); *In re Robinhood Order Flow Litigation*, 2022 WL 9765563, at *13 (N.D. Cal. Oct. 13, 2022) ("To state a claim under Rules 10b-5(a) or (c), a plaintiff must allege" elements specific to those subsections, "in addition to alleging the standard elements of a § 10(b) and Rule 10b-5 violation.").

5. *Motion to Strike*. Because the chart contains no new argument not present in the motion to dismiss, the motion to strike is denied.

\* \* \*

Any amended complaint must be filed within 21 days of this order, with a response due 21 days after the amended complaint is filed.

**IT IS SO ORDERED.**

Dated: October 2, 2024

_____

VINCE CHHABRIA
United States District Judge