ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
AELISH M. BAIG (201279)
HADIYA K. DESHMUKH (328118)
SNEHEE KHANDESHI (342654)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
aelishb@rgrdlaw.com
hdeshmukh@rgrdlaw.com
skhandeshi@rgrdlaw.com
        – and –
DANIELLE S. MYERS (259916)
MICHAEL ALBERT (301120)
KENNETH P. DOLITSKY (345400)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
malbert@rgrdlaw.com
kdolitsky@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| CHICAGO & VICINITY LABORERS' DISTRICT COUNCIL PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. 3:24-cv-00898-VC |
| | ) | CLASS ACTION |
| | ) ) | PLAINTIFF'S OPPOSITION TO |
| Plaintiff, | ) ) | DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT |
| vs. | ) ) | FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| AMPLITUDE, INC., et al., | ) ) | |
| | ) | DATE:    December 19, 2024 |
| Defendants. | ) ) | TIME:    10:00 a.m. JUDGE:  Hon. Vince Chhabria |
| | ) | CTRM:   4, 17th Floor |

4921-5917-9521.v2

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION AND BACKGROUND ........................................................................1

II.   LEGAL STANDARD.....................................................................................................2

III.  ARGUMENT...................................................................................................................2

    A.    The SAC Sufficiently Pleads Falsity ...................................................................2

        1.    Defendants' September 2021 Statements Gave Investors the False Impression that Strong Demand Had Fueled 2Q21 Financial Results and Expansion Rates Were Accelerating ......................................3

        2.    As Growth Slowed, Defendants' November Statements Gave Investors the False Impression that Accelerating Growth Was Continuing....................................................................................................5

        3.    Defendants' December Statements Gave Investors the False Impression that Expansions Were Accelerating from Years to Months or Weeks ...................................................................................7

    B.    The Market's Reaction to the February Disclosures Confirms Falsity...................8

    C.    The SAC Sufficiently Pleads a Strong Inference of Scienter .................................9

        1.    Defendants Knew Their September 2021 Statements Were False and Misleading...........................................................................................10

        2.    Defendants Knew the November 2021 Statements Regarding Continuing Demand Were False and Misleading ....................................10

        3.    Defendants Knew Their December 2021 Statements Were False and Misleading...........................................................................................12

        4.    Sales of Amplitude Analytics and Related Churn Were at the Core of Amplitude's Business...........................................................................13

    D.    The SAC Adequately Pleads a Fraudulent Scheme ...............................................14

    E.    The SAC Sufficiently Pleads Loss Causation.........................................................14

    F.    Control Person Liability is Alleged as to Individual Defendants ..........................15

IV.   CONCLUSION.................................................................................................................15

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .................................................................................................8, 13

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) .........................................................................................................3

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ...........................................................................................6

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
660 F.3d 1170 (9th Cir. 2011), aff'd, 568 U.S. 455 (2013) .........................................................5

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ....................................................................................................................14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ....................................................................................................................15

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) .........................................................................................................8

*Felipe v. Playstudios Inc.*,
2024 WL 1380802 (D. Nev. Mar. 31, 2024) .........................................................................11, 12

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .....................................................................................................4, 6

*Hayden v. Portola Pharms., Inc.*,
2021 WL 3506614 (N.D. Cal. Aug. 10, 2021) .............................................................................13

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...............................................................................................5, 9, 14

*In re Apple Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .........................................................5, 6, 12, 13

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .......................................................................................................14

*In re Coinbase Glob., Inc. Sec. Litig.*,
2024 WL 4053009 (D.N.J. Sept. 5, 2024) ....................................................................................10

**Page**

*In re Finisar Corp. Sec. Litig.*,
 646 F. App'x 506 (9th Cir. 2016) ........................................................................................2

*In Re Genius Brands Int'l, Inc. Sec. Litig.*,
 97 F.4th 1171 (9th Cir. 2024) ............................................................................................15

*In re Iso Ray, Inc. Sec. Litig.*,
 189 F. Supp. 3d 1057 (E.D. Wash. 2016)................................................................................10

*In re Oracle Corp. Sec. Litig.*,
 627 F.3d 376 (9th Cir. 2010) ............................................................................................12

*In re Robinhood Ord. Flow Litig.*,
 2022 WL 9765563 (N.D. Cal. Oct. 13, 2022)...........................................................................14

*In re Vaxart, Inc. Sec. Litig.*,
 2023 WL 3637093 (N.D. Cal. May 25, 2023)..........................................................................14

*In re Vaxart, Inc. Sec. Litig.*,
 576 F. Supp. 3d 663 (N.D. Cal. 2021) ...........................................................................3, 8, 15

*Jaeger v. Zillow Grp., Inc.*,
 644 F. Supp. 3d 857 (W.D. Wash. 2022)..............................................................................4, 5

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) ...............................................................................................2

*Lorenzo v. S.E.C.*,
 587 U.S. 71 (2019).........................................................................................................2, 14

*Miller v. Thane Int'l, Inc.*,
 519 F.3d 879 (9th Cir. 2008) ............................................................................................4, 7

*Nguyen v. Endologix, Inc.*,
 962 F.3d 405 (9th Cir. 2020) .............................................................................................12

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
 320 F.3d 920 (9th Cir. 2003) ...............................................................................................9

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
 575 U.S. 175 (2015).............................................................................................................4

*Pampena v. Musk*,
 705 F. Supp. 3d 1018 (N.D. Cal. 2023) ...............................................................................7, 9

**Page**

*Police & Fire Ret. Sys. of the City of Detroit v. Crane*,
    87 F. Supp. 3d 1075 (N.D. Cal. 2015) ...............................................................................11, 15

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ....................................................................................................12

*Provenz v. Miller*,
    102 F.3d 1478, 1492-93 (9th Cir. 1996) ...................................................................................5

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ....................................................................10, 11, 12, 13

*Ret. Tr. v. RH, Inc.*,
    302 F. Supp. 3d 1028 (N.D. Cal. 2018) ....................................................................................8

*Roberti v. OSI Sys., Inc.*,
    2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)...........................................................................13

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ...................................................................................................13

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ...................................................................................................11

*Sec. & Exch. Comm'n v. Prakash*,
    718 F. Supp. 3d 1098 (N.D. Cal. 2024) ...................................................................................14

*Shankar v. Zymergen Inc.*,
    2022 WL 17259057 (N.D. Cal. Nov. 29, 2022) .........................................................................8

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...................................................................................12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007).........................................................................................................2, 9, 10

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) .......................................................................................6

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ....................................................................................................5

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*,
    2024 WL 1327247 (N.D. Cal. Mar. 27, 2024)............................................................................7

**Page**

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
  §§78j(b)................................................................................................................................2
  §78u 4(b)(1)(B).....................................................................................................................2
  §78u 4(b)(2)(A).....................................................................................................................9

17 C.F.R.
  §240.10b-5(a), (c) ................................................................................................................2

## I.    INTRODUCTION AND BACKGROUND

Lead Plaintiff Chicago & Vicinity Laborers' District Council Pension Fund ("Plaintiff") filed the Second Amended Complaint ("SAC") to address certain deficiencies and provide additional particularized allegations following the Court's October 2, 2024 dismissal of its claims. ECF 63.   Plaintiff's amended allegations support the more than plausible inference that Defendants[1] artificially inflated the value of Amplitude stock with the issuance of materially false and misleading statements concerning their 2Q21 financial results, and the purportedly continuing demand for Amplitude Analytics and accelerating timelines for growth and expansion following the pandemic.  These misrepresentations were consistent with and in furtherance of Defendants' scheme to unload their Amplitude shares on unsuspecting investors with a direct listing, which requires less due diligence than a traditional IPO and has no lock-up period preventing immediate insider sales.  Defendants admitted that they were motivated to cash out existing shareholders that had privately invested in the Company.  The result – a skyrocketing share price as high as $83 per share following the direct listing allowing insiders (and not the Company) to pocket $158 million during the Class Period (September 28, 2021 to February 16, 2022, inclusive).

Less than five months after the direct listing, the truth was revealed as Defendants conceded to investors that: (i) 2Q21 results that appeared to be the result of strong demand were due to customer deals that were pulled forward from future quarters, which inflated 2Q21 results more than previously disclosed; and (ii) growth and expansion timelines were not accelerating from the post-COVID wave of digital adoption, and were not shrinking from years down to months or weeks.  These disclosures shocked investors as they were in stark contrast to Defendants' Class Period assurances of continuing and accelerating growth and caused Amplitude stock to plummet 59% in one day.

The Court's dismissal was based in part on the finding that 2Q21 pull-forwards had been disclosed to investors.  However, the SAC provides detailed allegations that the ***impact*** of those

---

[1]   "Defendants" are Amplitude, Inc. ("Amplitude" or the "Company"), and "Individual Defendants" Spenser Skates ("Skates"), and Hoang Vuong ("Vuong").  All "¶_" citations herein are to the SAC.  ECF 64.

deals remained concealed from the public until well after the direct listing and were not fully revealed until the February 2022 disclosures provided near mirror image corrections to the Class Period misrepresentations, establishing material falsity. The Motion[2] provides no persuasive response to these allegations, which must be viewed in context. Instead, it attacks the allegations in isolation and asserts the irrelevant fact that direct listings are legal. Securities fraud is not.

## II.   LEGAL STANDARD

"[A] court must consider the complaint in its entirety" and "accept all factual allegations in the complaint as true." *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).[3] To establish a claim under §10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b), and Rule 10b-5 promulgated thereunder, a plaintiff must allege: (i) a material misrepresentation or omission; (ii) made with scienter; (iii) in connection with the purchase or sale of a security; (iv) reliance; and (v) loss causation. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). It is unlawful to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit." 17 C.F.R. §240.10b-5(a), (c); *Lorenzo v. S.E.C.*, 587 U.S. 71, 78-79 (2019).

## III.   ARGUMENT

### A.   The SAC Sufficiently Pleads Falsity

Plaintiff need only specify each alleged false statement and the reasons why the statement is false.[4] 15 U.S.C. §78u 4(b)(1)(B); *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016). Even a literally true statement "may be misleading if it omits material information" and gives rise to liability where it gives investors a "false impression." *Khoja*, 899 F.3d at 1008-09, 1013-14; *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (omission

---

[2]   The "Motion" or "MTD" refers to Defendants' Motion to Dismiss Plaintiff's SAC. ECF 67.

[3]   All emphasis added and citations and footnotes omitted unless otherwise indicated.

[4]   Plaintiff only alleges the falsity of statements identified in ¶¶61, 86, 99. *See* ¶¶14 & n.3; MTD at 10 n.6. Plaintiff opposes Defendants' request for judicial notice to the extent documents are offered for the truth of the matters asserted. *See* ECF 67-12; *Khoja*, 899 F.3d 988 at 1014. Plaintiff does not oppose the Court's consideration of documents the SAC cites to or necessarily relies upon.

actionably misleading when it "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists").

### 1.    Defendants' September 2021 Statements Gave Investors the False Impression that Strong Demand Had Fueled 2Q21 Financial Results and Expansion Rates Were Accelerating

The SAC particularly alleges that during Defendants' September 14 Investor Day, Defendants represented "[w]e continue to see strong customer momentum" and "accelerating growth" in Amplitude's analytics products. ¶51. This momentum, according to Defendants, was being propelled by great post-COVID tailwinds creating an "uptake from customers that just has been absolutely amazing." ¶53. On September 21, one week before the direct listing, with investor expectations sufficiently primed, Amplitude reported exceptionally strong 2Q21 financial results owing to what Defendants reported was "great execution combined with strong demand." ¶56. Defendants reiterated that "[c]ustomer demand for Amplitude was exceptional" and expansions were a result of "strong demands from our products," and "strong customer upsells." ¶¶57-58. While Vuong reported 2Q21 results also included "some early customer renewal[s]," he misleadingly downplayed their impact on the quarter, claiming that larger expansion during 2Q21 was not a result of "one massive thing or another," but rather, "healthy" demand. ¶¶58, 60.

These results and Defendants' comments about them were made in the context of the August 30 Registration Statement and September 14 Investor Day statements that had set investors' expectations that Amplitude's growth was occurring at a faster pace than before the pandemic. ¶¶50, 52. *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 671 (N.D. Cal. 2021) (considering context of investor expectations set by defendants). For example, during Investor Day, Defendants told investors that once Amplitude landed a customer, those customers were "often quick to recognize additional digital products" that could benefit from Amplitude, *i.e.*, expand. ¶48. Defendants also claimed that the pandemic accelerated the timeframe in which customers adopt digital products – like Amplitude Analytics – going "***from months or years down to weeks***" thus fueling faster sales and customer expansions, which had previously taken up to six years. ¶¶49-50. Analysts thus reported on the exceptional results not as a one-time event, but "as

an acceleration of a long-term trend and not a short-term tailwind." ¶73; s*ee Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 872 (W.D. Wash. 2022) ("perceptions of analysts are an acceptable measure of what reasonable investors would have understood").

In truth, exceptional 2Q21 results were not a product of healthy accelerating demand, but the result of what a former employee ("FE") described as Defendants' strong push to complete deals before going public, and what Defendants would later admit to be the significant impact of pulled-forward deals from future quarters. ¶¶87(a), 107. In fact, in January 2022, after 4Q21 close and based on conversations with Amplitude customers, UBS reported ***2Q21 results*** were likely due to customers' "pull-forward in spend . . . that inflated [Amplitude's] growth" which may have put "downward pressure on topline growth and dollar-based net expansion rates in the quarters ahead." ¶101. On February 16, 2022, after reporting slowing growth and shockingly extended timelines for expansions, Defendants admitted that 2Q21 results were in fact the product of a "***one-time***" boost in demand, and 2Q21 was thus a "***stronger quarter than normal***" as a result of the early expansion activity. ¶107. Vuong then acknowledged the cause as "a pull-forward in 2021." ¶114.

Defendants argue (and the Court previously agreed) that Vuong disclosed that 2Q21 results were driven by early renewals. MTD at 9; ECF 63 at 2. But, Plaintiff does not allege Defendants failed to disclose the fact of early renewals.[5] *See* ¶¶58, 61(b). Rather, the failure to disclose the ***impact*** of those renewals rendered the omission misleading. An analyst's reaction to the 2Q21 disclosure about pull-forwards actually corroborates the allegation that "Amplitude did not size the impact these early renewals had on key metrics" and investors did not understand them to be "vastly different from past quarters." ¶72; *see In re Apple Sec. Litig.*, 2020 WL 6482014, at *6

---

[5]    In fact, the SAC incorporates Vuong's statements verbatim concerning early renewals. Defendants' further attempt to extract purportedly accurate fragments of the alleged false statements about accelerating growth and strong demand ignores their context. MTD at 7. *See Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Failure to consider context also vitiates Defendants' puffery challenges. MTD at 7 n.2. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 771 (9th Cir. 2023). If any alleged statements can be construed as opinion (they are not) then Plaintiff only alleges falsity of embedded statements of fact therein. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:24-cv-00898-VC        - 4 -
4921-5917-9521.v2

(N.D. Cal. Nov. 4, 2020) (that analysts interpreted the statements precisely as plaintiffs alleged supports falsity); *Jaeger*, 644 F. Supp. 3d 857.

More importantly, Defendants' arguments that the allegedly omitted information was already disclosed and therefore the misstatement could not be false, is a thinly veiled truth-on-the-market defense that is reserved for trial, not the pleading stage.  MTD at 3-4, 6, 8-9, 11.  "[A]s the Supreme Court and Ninth Circuit have explained, the truth-on-the-market defense is a method of refuting an alleged misrepresentation's **materiality**."  *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011), aff'd, 568 U.S. 455 (2013) (internal citations omitted).  Moreover, "before the 'truth-on-the-market' doctrine can be applied, the defendants must prove the information that was withheld or misrepresented was '"transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations."'"  *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996).  As discussed *supra*, one UBS analyst's understanding of Vuong's statements regarding the impact of early renewals and expansions in 2Q21 establishes that she did not perceive that activity to be particularly concerning at the time the statement was made.  ¶72.[6]

> **2.**      **As Growth Slowed, Defendants' November Statements Gave Investors the False Impression that Accelerating Growth Was Continuing**

On November 9, 2021, Amplitude issued its 3Q21 financial results, reporting slower growth and, unexpectedly an only modestly increased quarterly revenue target.  ¶75.  Defendants nevertheless asserted that existing demand for Amplitude products remained strong, and Q3 results were "continuing **the momentum we're seeing** in digital optimization" and that it was both 2Q21 expansions and post-COVID tailwinds "that **are contributing** to our growth rate."  ¶77.  Analysts

---

[6]   Any disclosure of hypothetical risks purportedly warned of in the Registration Statement, (MTD at 3; ECF 63 at 3), only protects forward-looking statements made in September and does nothing to protect November and December statements concerning the strong momentum that Amplitude was seeing because by the time the later statements were made, Amplitude was seeing or anticipating significant churn from its largest customers.  *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021) (safe harbor does not protect statement about current or past facts); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (risk disclosures that do not alert the reader that some of the risks may already have come to fruition are insufficient).

sought clarity on what appeared to be weaker expansion rates than Amplitude's peers and Vuong explained it was simply a shift in customer mix and encouragingly reported "*we continue to see great momentum*" in Amplitude's largest customers. ¶82.  In this context, Amplitude reaffirmed the FY22 guidance it issued in September – conveying the strength of Amplitude's business had not changed. ¶78.

The truth, as alleged, was that in 4Q21 – *i.e.*, as early as October 2021 – Amplitude was identifying red flags regarding anticipated reduction or cancellation of contracts. ¶87(b).  As reported by FE2, *by November*, the COVID tailwinds had already become headwinds as customers were finding it more difficult to afford Amplitude products.[7] ¶87(c).  According to FE1, by the middle of November 2021, deal reductions were already significant. ¶87(a); *see Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 867 (N.D. Cal. 2023).

Moreover, an examination of Vuong's statements show they were present tense statements about the momentum "we're see*ing*" and the factors that "*are* contribut*ing*" to Amplitude's growth. ¶77.  Further, Vuong was asked about the current state and trajectory of Amplitude's expansion rates and responded with a "present-tense description" of the momentum Amplitude was continuing to see, citing past growth in customers $100,000 and over $1 million as an illustration of that description. *Apple*, 2020 WL 6482014, at \*5; ¶82; *see Weston*, 669 F. Supp. 3d at 874-75 ("[W]e're not seeing any difference in churn rates . . ." is a statement of current fact, although disclosed in the context of prior quarter earnings.); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 465, 468 (S.D. Tex. 2016) ("[O]ur core technology is continuing to operate as designed" referred to "then-present factual conditions.").  Vuong's positive statements, even of past results, "were misleading when considered in context with assurances" of strong demand and faster expansion timelines. *Miller*, 519 F.3d at 886; *York Cnty. on Behalf of Cnty. of York Ret. Fund v.*

---

[7]    As the Court found, "particularized allegations to support the claim that growth was slowing or contracting are the confidential witness statements."  ECF 63 at 3.  Because the SAC sets forth the duration of each FE's employment, their job titles, and job responsibilities in support of their reliability, the facts attributed to them are adequately pleaded. *Glazer*. 63 F.4th at 771; ¶¶44(a)-(b), 87(a)-(c).  Further, FE1 and FE2 both reported customer contraction during November that are "corroborating allegations [that] also support their reliability." *Weston*, 669 F. Supp. 3d at 882.

*HP Inc.*, 2024 WL 1327247, at \*19 (N.D. Cal. Mar. 27, 2024).  Indeed, Defendants' word choice of "continue" throughout the Class Period communicated Amplitude was maintaining its past "great momentum."  ¶¶82 & n.10; *see* ¶¶51, 57, 76-77, 83, 91.  And, by reaffirming the FY22 outlook given on Investor Day, Defendants impressed on investors that growth was continuing. ¶78.  Accordingly, analysts reported, "high growth persists," "positive outlook unchanged."  ¶83.

### 3. Defendants' December Statements Gave Investors the False Impression that Expansions Were Accelerating from Years to Months or Weeks

On December 7, 2021, with only three weeks left in the quarter, Skates reiterated that customer expansion plans that previously "were supposed to take maybe years" were happening in "the course of months or weeks."  ¶91.  This too, was initially reported during the September 14 Investor Day.  ¶50 ("[t]he pandemic . . . accelerated everything where digital transformation went from months or years down to weeks . . .").  UBS asked if Amplitude was seeing "***any impact***" or "***risk***" because of 2Q21 "early renewal[s] and pull-forward activity."  ¶93.  Vuong acknowledged that some of the 2Q21 renewals and expansion "probably was unscheduled," but again failed to disclose the "impacts" on future growth that the analyst specifically asked about. *Id.*  Instead, Vuong "reported accelerated growth in new customers" and that Amplitude customers "have really big expansions."  *Id.*  These statements were contrary to facts reported by the FEs that, by November, the post-COVID tailwinds had become headwinds.  ¶¶87(c), 92.  By the middle of November, *i.e.*, well before December 7, customers were significantly reducing spend on Amplitude.  ¶87(a).  Amplitude's Customer Success team was sounding the alarm for accounts known to be at risk.  ¶¶87(a)-(c), 92.  These were "fact[s] which would certainly be material to an investor given the nature of [Amplitude's] business" as Amplitude itself considered churn an essential metric to track for subscription-based services like itself.  *Pampena v. Musk*, 705 F. Supp. 3d 1018, 1044 (N.D. Cal. 2023); ¶5 n.1.  Defendants' December statements that expansions were continuing to occur within "months or weeks," created a materially misleading impression of the business' true state of affairs.  ¶91; *see Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987

(9th Cir. 2008); *Vaxart*, 576 F. Supp. 3d at 670 (statements created a "materially misleading impression" in the context of defendants' prior statements).

Further, the "very short time period between the [false] statement and the adverse disclosures, suggest[s] that these facts were knowable at the time the [false] statement was issued." *Shankar v. Zymergen Inc.*, 2022 WL 17259057, at *2 (N.D. Cal. Nov. 29, 2022). Where, like here, Defendants have not identified any intervening events that occurred between the misrepresentations and disclosure, courts place even "more weight" on temporal proximity. *Fecht v. Price Co.*, 70 F.3d 1078, 1083-84 (9th Cir. 1995); *see City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1042 (N.D. Cal. 2018) (eight week gap).

The argument, previously credited by the Court, that Defendants had adequately set the expectation that expansion would likely take years by citing examples of customers that had expanded ***before the pandemic*** fails because Defendants told investors that expansion was occurring at a faster pace as a result of post-COVID tailwinds. ¶¶48-50; MTD at 8-9, 11; ECF 63 at 2. Those pre-COVID expansion examples were only relevant as a point of contrast to the current, post-COVID accelerated rates of customer expansion.[8] In the same vein, Vuong's September 14 statement that "we don't know exactly" when expansions would occur cannot be viewed as an adequate disclosure when during his same response he also touted that the pandemic had caused a "sustainable" trend toward digital adoption that was causing customers – and thus Amplitude – to grow faster. ¶52; MTD at 8; ECF 63 at 2. These allegations are plausibly pled.

### B.    The Market's Reaction to the February Disclosures Confirms Falsity

The February 16, 2022 disclosures that customer expansion timelines were not accelerating at a faster pace than before the pandemic, and in fact "can take a few years," stood in sharp contrast to Defendants' Class Period statements that claimed that customer plans had been accelerated into the course of "***months or weeks***." *Compare* ¶¶50, 91 *with* ¶¶104,105 ("it can take many years . . .

---

[8]    Vuong's statement on Investor Day that "sometimes it may take them five years" is also not an adequate disclosure because it was made in reference to $1 million customers, which he said as late as November 2021 were continuing to see strong momentum. MTD at 3; *Compare* ECF 67-5 at 30 *with* ¶82. If relevant at all, it corroborates Plaintiff's allegation that the expansion timelines can be determined by looking at weekly learning users. *See infra* at §III.C.

that process, it can take a few years"). The disclosure that 2Q21 growth was in fact a "***one-time***" event that was dependent on early expansion causing it to be "a stronger quarter than normal," and that Defendants had "obviously expected that growth rate to kind of slow down or decline," was contrary to Vuong's September statements that 2Q21 growth "came pretty healthy in terms of the larger expansion coming from," organic demand and Vuong's affirming the FY22 outlook in November. *Compare* ¶60 *with* ¶¶104, 107. Finally, the Company cut its guidance range when it had reaffirmed that guidance in November. *Compare* ¶78 *with* ¶103.

Investors were floored by the incongruence between Defendants' prior statements and the announcements just a few months later. *See* ¶¶109-113. For example, Citigroup found that the disappointing news coming "just two quarters" after the direct listing was "hard to reconcile." ¶109. BofA questioned practically all of Defendants' previously-disclosed business metrics, including the impact of pull-forwards, demand trends, and execution risks. ¶111. The market's reaction, including the stock price plummeting almost 60%, belies any notion that the news disclosed on February 16, 2022 was previously known to the public. ¶¶85, 89; *see Alphabet*, 1 F.4th at 703 (market reaction and media coverage occurring after disclosure all support the materiality of the misleading omission); *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003); *Pampena*, 705 F. Supp. 3d at 1043 ("[t]he immediate market reaction . . . further supports materiality").

### C.    The SAC Sufficiently Pleads a Strong Inference of Scienter

A complaint pleads scienter if it "state[s] with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. §78u 4(b)(2)(A). A "'strong inference'" of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences'"; and allegations of motive are not required. *Id.* at 324-35. "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326.

### 1.     Defendants Knew Their September 2021 Statements Were False and Misleading

On September 21, 2021, when Vuong told investors that 2Q21 results were "driven in part by . . . some early customer renewal that took place in the quarter," there is a strong inference that he knew that the early renewals had a substantial impact on 2Q21 and obscured the true demand for Amplitude's products, as was admitted later. ¶¶58, 107, 114.  Courts presume that an executive speaking to investors on a matter of importance does so with knowledge of the truth, or is deliberately reckless in not knowing the truth.  *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014). That the September statements were made more than one month after Amplitude's second quarter had ended on June 30, 2021 further supports the inference that Defendants actually knew the size and impact of early renewals on 2Q21 financial results.  *See* ¶¶48-60.  In fact, Vuong later admitted that when Defendants issued 2Q21 results in September, they "obviously had a lot more visibility" into their reported financial outlook and into "what we're doing over the next few weeks."  ¶80.

Defendants were also highly motivated to inflate 2Q21 revenue and financial metrics because they went public just one week after the financial report and because of their choice of a direct listing, they stood to (and did) gain $47 million because there was no traditional lock-up period.  *See Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference").  Since the issue was last briefed, at least one court has found that the financial motive in a direct listing bolstered an inference of scienter.  *See In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *16 & n.5 (D.N.J. Sept. 5, 2024).[9]

### 2.     Defendants Knew the November 2021 Statements Regarding Continuing Demand Were False and Misleading

When a defendant chooses to tout positive qualities of the very adverse issues that are alleged to be omitted, courts infer that the defendant intended to omit the negative information.

---

[9]   That Defendants met their originally-issued guidance does not negate scienter and is not relevant because the allegations concern customer growth timelines, not revenue guidance.  MTD at 15.  "'The ultimate profitability of a course of conduct is not conclusive of intent. Just as we cannot countenance pleading fraud by hindsight, neither can we infer innocence by hindsight because the alleged misdeeds did not pay off.'"  *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1076 (E.D. Wash. 2016).

*See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016); *Police & Fire Ret. Sys. of the City of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1085 (N.D. Cal. 2015).  On November 9, 2021, Vuong conveyed that Amplitude was "continuing the momentum we're seeing in digital optimization" and assured investors that Amplitude was still well-positioned to meet its FY22 revenue outlook despite what appeared to be significant signs of slowing demand.  ¶¶77-78. Vuong also told investors that "we continue to see great momentum" in Amplitude's largest customers in response to a question about Amplitude's expansion timelines.  ¶82.  But, by then, the purported post-COVID tailwinds had become headwinds, leading Amplitude customers to spend less; as a result, Amplitude was seeing significant signs of and was raising alarms as to churn during at-risk meetings devoted to Amplitude's large, strategic accounts.  ¶87(a)-(c).

Vuong's other statements made during the Class Period raise a strong inference that he had access to the data that would show signs of churn or slowing demand.  On November 30, 2021 Vuong explained that a key metric Amplitude uses to gauge user activity and growth is its "weekly learning users."  ¶89.  In fact, he "'bridged the [scienter] gap' [him]self by referencing the data directly" when he told investors on September 14 about previous instances in which Amplitude had seen churn, such as during 2020, confirming that he had access to churn data and raising a strong inference that Vuong also knew about the currently existing churn.  *Reese*, 747 F.3d at 572; ¶52; ECF 67-5 at 30.  Vuong also admitted Defendants had "obviously *expected* [the 2Q21] growth rate to kind of slow down or decline."  ¶104.  These allegations are sufficient.  *Felipe v. Playstudios Inc.*, 2024 WL 1380802, at *17-*18 (D. Nev. Mar. 31, 2024) (crediting allegations of defendants' access to information, other positive statements about the omitted information, temporal proximity, and CW allegations).  At minimum, the facts support a strong inference that Vuong acted with deliberate recklessness for not checking "that facts on the ground" to which he had clear access supported his claims.  *Apple*, 2020 WL 6482014, at *12; *see In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010).

### 3. Defendants Knew Their December 2021 Statements Were False and Misleading

On December 7, when asked about the current "demand environment" for Amplitude products and "how durable [Skates] [thought] some of these trends are," Skates told investors *again* that the pandemic "accelerated plans that were supposed to take *maybe years into the course of months or weeks*." ¶91. Because Defendants made "detailed factual statement[s], contradicting important data to which [the Individual Defendants] had access, a strong inference arises that [they] knowingly misled the public as to its clear meaning." *Reese*, 747 F.3d at 572. This response about expansion timelines directly contradicted the data to which Skates had access, including his monitoring of customer usage "predominantly on a weekly basis." ¶95. Skates participated in meetings pertaining to high profile customer accounts. ¶44(a). At meetings to discuss large, strategic accounts, in 4Q21, employees raised red flags regarding anticipated churn and sounded alarm bells as to companies at risk. ¶¶44(a), 87(b), 92. Skates was involved with attempting to mitigate churn for almost any large account that was seeing significant churn. ¶¶87(b), 92.[10] These facts create a strong inference that Skates was aware by the middle of November that Amplitude was experiencing significant partial churn representing significantly reduced spend by Amplitude customers that was expected to extend into FY22. ¶¶44(a)-(b), 87(a)-(c).

Additionally, the radically different position Skates took concerning expansion timelines just ten weeks later on February 16, 2022, conveying that expansion plans were actually "a many-year thing away," further supports an inference of scienter with respect to his December statements that expansion timelines had been accelerated to the course of "months or weeks." ¶¶91, 105; *see Reese*, 747 F.3d at 574-75 (temporal proximity of three to six months between the false statement and a disclosure bolstered inference of scienter); *Berson*, 527 F.3d at 988 n.5 (two weeks); *Roberti*

---

[10] Whether Vuong or Skates communicated with either FE is not dispositive and *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061-62 (9th Cir. 2014) and *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020) are inapt as Plaintiff does not allege FEs knew Defendants' state of mind. MTD at 11, 13; *see also Felipe*, 2024 WL 1380802, at *17 (crediting CWs who did not interact directly with any defendant). Anyway, the SAC alleges "FE1 participated in meetings with Skates . . . on numerous occasions." ¶¶44(s), 87(a). Even if the FEs' "statements are unreliable as to the individual Defendants' state of mind, they reliably bolster the" inference of scienter. *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1146 (N.D. Cal. 2017).

*v. OSI Sys., Inc.*, 2015 WL 1985562, at *11 (C.D. Cal. Feb. 27, 2015) (six months); *Apple*, 2020 WL 6482014, at *10-*12 (two months).

### 4.   Sales of Amplitude Analytics and Related Churn Were at the Core of Amplitude's Business

Defendants' scienter is also inferred through the core operations doctrine.  ¶¶125-126. Courts can make inferences about management's access to information "without accompanying particularized allegations [of actual access], where [as here] the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge." *Reese*, 747 F.3d at 575-76.[11]  Amplitude reportedly "derive[d], and expect[ed] to continue for some time to derive, **substantially all** of [its] revenue from [its] Amplitude Analytics product."  ¶8. Amplitude explained it was "crucial to monitor the churn rate as it directly affects their revenue and overall business performance."  ¶5 n.1.  In fact, Defendants had reported instances of churn before and Skates was involved with any large account seeing significant churn. ¶¶52, 87(b). Defendants also regularly monitored their "weekly learning user[s]," which was Amplitude's "North Star Metric," and "key measure of success."  ¶54 & n.6.  Both Skates and Vuong explained that Amplitude utilized weekly learning users to monitor customers' likelihood of growth.  ¶¶89, 95.  Given Amplitude made a business providing a service that gives insight into how its customers can minimize churn, and considered churn a critical metric to monitor for subscription services like itself, "any suggestion that the company's officers and directors were not aware" of such critical information, including the churn reported by the former employees "would be absurd." *Hayden v. Portola Pharms., Inc.*, 2021 WL 3506614, at *5 (N.D. Cal. Aug. 10, 2021), *rev'd in part*, 2022 WL 4374962 (N.D. Cal. Jan. 20, 2022); ¶87(a)-(c).  It is thus reasonable to infer that Defendants knew the details of the 2Q21 pull-forward and that expansions were not accelerating at a pace faster than pre-pandemic rates that supported the FY22 outlook or claims that expansion was occurring in months or weeks.  *See* ¶87(a)-(c).

---

[11]   For this reason, Plaintiff need not allege that additional specific information was conveyed to management.  *See* MTD at 14.  Further, the core operations allegations are part of the court's holistic analysis.  *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).

**D.      The SAC Adequately Pleads a Fraudulent Scheme**

The alleged false and misleading statements are but one component of the alleged fraudulent scheme. "Scheme liability under (a) and (c) can be based on a scheme to take advantage of misleading statements – even while subsection (b) speaks to the actual making of such statements." *In re Vaxart, Inc. Sec. Litig.*, 2023 WL 3637093, at *3 (N.D. Cal. May 25, 2023). These provisions can be violated at the same time. *See Lorenzo*, 587 U.S. at 78-81; *Alphabet*, 1 F.4th at 709.[12] Here, the detailed allegations easily make out a scheme violation. First, Defendants pursued a speedy direct listing, which was specifically designed to provide an immediate financial benefit to the Company's insiders and venture capitals backers - to the tune of $275 million. ¶¶5, 12, 18, 24, 43, 64-70, 90, 100 n.13. Second, Defendants failed to disclose the impact of the 2Q21 pull-forwards which had the effect of inflating the financial results just two weeks before the direct listing. ¶¶58, 101, 107. Third, Defendants misleadingly misrepresented the speed of growth by citing post-COVID tailwinds to bolster the credibility of their statements that expansions were accelerated from the course of years to months or weeks and to neutralize any risks from the reported early renewal activity. ¶¶48, 50, 52, 91. Taken together, the SAC adequately pleads an intentional fraudulent scheme. *See Vaxart*, 2023 WL 3637093, at *4.

**E.      The SAC Sufficiently Pleads Loss Causation**

To plead loss causation, a complaint must provide defendants notice of what "the causal connection might be between [plaintiff's] loss and the misrepresentation." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Though "a disclosure 'need not precisely mirror the earlier misrepresentation,'" they do so here. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020). The SAC alleges the disclosure revealed that expansions would take, not "months or weeks," but instead, "years," resulting in a reduced 2022 outlook precipitating the stock price decline. ¶¶91, 104-105; *see* ¶¶108, 127-140; *see also supra* §III.B. (comparing disclosures to

---

[12]  *In re Robinhood Ord. Flow Litig.*, 2022 WL 9765563, at *13 (N.D. Cal. Oct. 13, 2022), is inapt; *see Sec. & Exch. Comm'n v. Prakash*, 718 F. Supp. 3d 1098, 1108 (N.D. Cal. 2024) (*Lorenzo* forecloses argument that scheme liability claims require conduct beyond misstatements).

alleged false statements).  The "loss was therefore directly related to the facts the [D]efendants omitted the prior quarter.  This is sufficient."  *Crane*, 87 F. Supp. 3d at 1086.

Tellingly, Defendants never suggest there was some intervening cause such as "'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, [or] conditions'" that caused the loss.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813, (2011).  Yet, they continue to maintain the market already knew the alleged omitted information was disclosed.  The Ninth Circuit, however, has explained that the mere fact that some information was public does not negate the character of a corrective disclosure, such as when "'the alleged corrective disclosure provide[s] new information to the market that was not yet reflected in the company's stock price.'"  *In Re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1186 (9th Cir. 2024).  Here, the impact of the early renewals, as UBS noted, had not been previously sized, and certainly had not been fully understood by the market, as reflected by the enormity of the stock price decline.  *Id.* at 1184-85, 1188 (requiring consideration of whether the market understood the disclosure to be new corrective information).

### F.    Control Person Liability is Alleged as to Individual Defendants

As the SAC adequately alleges Skates and Vuong controlled Amplitude's decision making "'including the content and dissemination of the various statements'" giving rise to a claim under Rule 10b-5, the §20(a) claims should be upheld.  *Vaxart*, 576 F. Supp. 3d at 675; ¶¶45-47.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

DATED:  November 27, 2024                ROBBINS GELLER RUDMAN
                                                             & DOWD LLP


                                                                  s/ Shawn A. Williams
                                                             SHAWN A. WILLIAMS

SHAWN A. WILLIAMS
AELISH M. BAIG
HADIYA K. DESHMUKH
SNEHEE KHANDESHI
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
aelishb@rgrdlaw.com
hdeshmukh@rgrdlaw.com
skhandeshi@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
DANIELLE S. MYERS
MICHAEL ALBERT
KENNETH P. DOLITSKY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
malbert@rgrdlaw.com
kdolitsky@rgrdlaw.com

Lead Counsel for Lead Plaintiff