UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHICAGO & VICINITY LABORERS' DISTRICT COUNCIL PENSION FUND,<br><br>Plaintiff,<br><br>v.<br><br>AMPLITUDE, INC., et al.,<br><br>Defendants. | Case No. 24-cv-00898-VC<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 67 |

The motion to dismiss is granted and the case dismissed with prejudice. This order assumes the reader's familiarity with the facts, governing legal standards, and arguments made by the parties. The defendants' request for judicial notice is granted because judicial notice can be taken of SEC filings, press releases, conference call transcripts, and analyst reports for the purpose of determining what information was available to the market. *E.g.*, *In re Splunk Inc. Securities Litigation*, 592 F. Supp. 3d 919, 930 (N.D. Cal. 2022).

*Falsity.* The plaintiff has not adequately pled any materially misleading statements or omissions by Amplitude, Skates, or Vuong.

As discussed in the first order, the defendants did disclose that Amplitude's strong Q2 results were driven by early renewals. That they did not explicitly discuss the impact of early renewals on future quarters does not make their statements plausibly misleading because it would have been "obvious to any reasonable investor" that renewals counted early (in Q2) would not be counted in a future quarter. *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1410 (9th Cir. 1996).

The defendants also disclosed that Amplitude's sales strategy could take years to pay off. As discussed in the previous order, Vuong said that Amplitude didn't "know exactly" how long digital adoption (and adoption of Amplitude's products specifically) could take. And there is no indication that the examples Skates gave of multiyear expansions were actually framed as examples of how long growth used to take, before COVID-19 accelerated digital adoption. To the contrary, Skates introduced them positively, as examples of the company's "continued growth" and "powerful land and expand motion." And viewed in context, Johnson's statement that the pandemic "accelerated everything where digital transformation went from months or years down to weeks" was about businesses moving their operations online, not about them adopting Amplitude specifically. Skates's similar statement that Amplitude saw a lot of interest from customers because "the pandemic has really accelerated plans that were supposed to take maybe years into the course of months or weeks" also appears to describe a trend in customers' digital adoption that in turn affected Amplitude's business.

The plaintiff says that whether the defendants disclosed these things can't properly be considered at the pleading stage. But the Ninth Circuit has affirmed multiple dismissals on exactly this basis. *E.g.*, *Oregon Public Employees Retirement Fund v. Apollo Group Inc.*, 774 F.3d 598, 607 (9th Cir. 2014); *Jedrzejczyk v. Skillz, Inc.*, 2024 WL 1635568, at *2 (9th Cir. Apr. 16, 2024).

The plaintiff also fails to state a claim based on its theory that, during November and December, the defendants made misleadingly positive statements about the general state of Amplitude's business. First, some of the statements that the plaintiff points to as examples of the defendants claiming that Amplitude was continuing to grow rapidly clearly regard something else. For example, Skates's statement that "customers who are already on Amplitude continue to experience growth in their user bases" refers to growth by Amplitude customers, not by Amplitude itself. And as noted above, Skates's statement that "the pandemic has really accelerated plans that were supposed to take maybe years into the course of months or weeks" regards digital adoption generally, not adoption of Amplitude specifically.

Second, even if some statements may have helped create a positive perception of Amplitude's business, Amplitude's slowing growth appears to have been disclosed to investors. When the company announced its Q3 results, it also forecasted lower year-over-year growth for Q4. And at the Q3 earnings call—where Vuong made the allegedly misleading November statements—Vuong and analysts discussed how this forecasted growth was "materially below" that of the past several quarters.

Third, the complaint does not state with particularity any facts about the "real" state of Amplitude's business that would make the defendants' positive statements misleading. The confidential witnesses provide only general characterizations: that there was "significant" partial churn in certain regions and that it became harder for Amplitude's clients to get approval to spend more on Amplitude. The complaint does not say how much churn was actually occurring, how much that churn threatened Amplitude's business, or whether customers' difficulties getting budget approval actually translated into meaningfully reduced spending on Amplitude. Similarly, the complaint contains no specifics regarding the degree to which Q2 results were actually driven by early renewals. These allegations are not sufficient to render the defendants' statements materially misleading, let alone to render their disclosures inadequate.

*Scienter.* The allegations in the complaint also fail to raise a strong inference of scienter. Considering all the allegations in the complaint, the most compelling inference is that the defendants acted in good faith by disclosing risks facing the company and other caveats and by lowering projections once they had reason to do so—in other words, that they did what defendants in securities fraud cases are often accused of failing to do.

The plaintiff's reliance on the core operations inference (and other similar presumptions) fails because the complaint does not state with enough specificity what it is that the defendants must have known. The plaintiff may be right that Skates and Vuong would necessarily have known about the degree of partial churn in large accounts, the number of weekly learning users, and the extent to which Q2 results were driven by early renewals. But as discussed with respect to falsity (and as noted in the first order), the complaint does not provide any "hard numbers" or

3

other detail about any of those metrics. So it's not clear what Skates and Vuong would have actually known—or that what they knew meant that they made the allegedly misleading statements with knowledge or deliberate recklessness. *See, e.g.*, *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002); *Police Retirement Systems of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *18–19 (N.D. Cal. May 22, 2012).

Nor do the complaint's allegations regarding direct listings raise or bolster a strong inference of scienter. While the defendants may have had a financial motive to pursue a direct listing instead of a traditional IPO, financial motive alone is insufficient for scienter. *In re Rigel Pharmaceuticals, Inc. Securities Litigation*, 697 F.3d 869, 884–85 (9th Cir. 2012). And unlike in the case cited by the plaintiff, *In re Coinbase Global, Inc. Securities Litigation*, the complaint contains no other allegations raising an inference of scienter that could be bolstered by financial motivation. *See* 2024 WL 4053009, at *14–17 & 2 n.5 (D.N.J. Sept. 5, 2024).

*Other claims.* Because the plaintiff's § 10 and Rule 10b-5 claim fails, so do its scheme and § 20(a) claims. *In re Robinhood Order Flow Litigation*, 2022 WL 9765563, at *13 (N.D. Cal. Oct. 13, 2022); *Abdo v. Fitzsimmons*, 2021 WL 616324, at *11 (N.D. Cal. Feb. 17, 2021); *In re NVIDIA Corp. Securities Litigation*, 768 F.3d 1046, 1052 (9th Cir. 2014).

\* \* \*

The plaintiff has been given leave to amend once. The second amended complaint did not fix some of the issues identified in the order granting the first motion to dismiss. Therefore, the Court concludes that further amendment would be futile, and the case is dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: January 13, 2025

_____
VINCE CHHABRIA
United States District Judge